IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 05 CR 332 |
| | ) | The Honorable John W. Darrah, |
| CHRISTOPHER LENTI, | ) | Judge Presiding |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM

## I.  INTRODUCTION

Christopher Lenti is scheduled to be sentenced on January 25, 2007 by this Honorable

Court.  This memorandum is hereby submitted for consideration in light of and in addition to the

Presentence Report prepared by Ms. Kelly Kwong of the United States Probation Department.

As this court will recall, on September 20, 2006 Mr. Lenti pled guilty, pursuant to a plea

agreement, to one misdemeanor count of filing an income tax return containing materially false

statements, in violation of Title 26, United States Code, Section 7207.  In doing so, he and the

government came to an agreement as to the amount of the loss to the United States government

based upon the false statements on his tax returns.

The purpose of this memorandum is not to diminish the seriousness of the crime to which

Mr. Lenti has pled guilty or to, in any way, excuse his actions.  Instead, the goal of this

memorandum is to provide this Honorable Court with a more complete picture of Mr. Lenti prior

to imposing a sentence in his case.  This memorandum along with the Presentence Report will

make clear how Mr. Lenti's conduct of conviction was a significant and unprecedented deviation

from an otherwise exemplary personal and professional life.  He has never committed another act

of wrongdoing even close to the one for which he pled guilty.  Mr. Lenti accepts full and

complete responsibility for his actions and acknowledges the consequences of his actions for the

government, the Chicago Police Department, and for his family and friends.  What follows is

intended to give this Court background information on Mr. Lenti, explain the kind of person he

is, and the kind of police officer he is.  In addition this memorandum endeavors to explain the

situation face by Mr. Lenti leading to this day as well as certain factors in mitigation for the

Court to consider in crafting an appropriate sentence.

## II.  FAMILY AND PERSONAL BACKGROUND

Christopher Lenti was born and raised in Chicago.  The oldest of three children, Chris

was raised in a close-knit family.  From an early age, his way was one of extraordinary generosity

and sincere concern for others.  Chris's sister, Debbie Carroll, described him as follows in the

letter of support she provided[1]:

> As far back as I can remember, Chris has always been the typical "older brother."
> For my brother Jimmy and me, he's always been the one giving advice, talking us
> through things, and helping out where he can.

Members of the Franzese family, close friends of the Lenti family, recalled Chris's

ability, at an early age, to put people at ease.  He enabled people to feel unashamed about

confiding in him, as well as taking every opportunity to lend a helping hand, unembarrassed to

stand up for the "underdog."  As Mauro Franzese related:

---

[1] All of the quotes about Christopher Lenti contained in this Memorandum are taken from the numerous
letters of support written on Christopher Lenti's behalf.  Those letters were provided to this Honorable
Court and to the United States Attorney's Office on January 17, 2007 by Kelly Kwong, United States
Probation Officer.

Since he was a child, Chris has fought for the underdog. I give you the following example: at a family party in the early eighties, we were playing football in the street. I did not want my younger brothers to play. As the oldest brother, I didn't think it was "cool" to hang around with them and didn't feel they were good enough to play with the big kids. Chris not only insisted they play, but took them on his team. Whenever he has the chance, he helps those who are weaker than him, or anyone who needs his help, for that matter.

Robert Franzese confirmed this in his letter by saying:

I have always thought of Chris as an older brother, and I have looked up to him as one. He is the type of person who makes you earn respect and want to keep it, once it has been earned.
Chris has always been willing to 'take up the cause' of the weaker person. In a group situation, he often helps the youngest, or the one who is the outsider. Chris is always willing to lend an ear when needed and has great advice.

Since his freshman year at Mt. Carmel High School, Chris Lenti dreamt of becoming a police officer like many members of his family, including his father, who were police officers. He worked hard academically, earning above average grades, and was an active member of the Mt. Carmel Student Council. In addition, Chris was a stand-out player on the school's football team, which won three state championships while Chris was there. His football prowess and academic achievement led him to the Illinois State University based on the school's promise that he would be offered a football scholarship. When the promised scholarship did not materialize, Chris was unable to afford the tuition at Illinois State.

While still wanting to pursue his education despite this financial setback, Chris transferred to Moraine Valley Community College. He worked a full-time job, including over-time whenever possible during school. All the while, his goal of having a career in law enforcement never wavered. Chris prepared for the Chicago Police Department's qualification

exam. When it came time to take the exam, he qualified. He was hired on May 5, 1997 as a

patrol officer for the Chicago Police Department.

### III. CHRIS LENTI, THE CHICAGO POLICE OFFICER

As a police officer, Chris immediately made a positive impact on those who worked

alongside him, as well as the community he served and protected. Dedicated to his work and

loyal to the oath he took, Chris exemplified the type of police officer the Chicago Police

Department proudly employs. Chris's supervisor, Sergeant Thomas Taglioli observed:

> I never had any type of problems with Chris and always trusted him with every
> assignment I gave him. He was a popular teammate who got along well with
> everyone on our team. If a situation arises in the future, I would not hesitate having
> Chris work for me again.

A fellow police officer,Cesar Caudio, said in his letter:

> I had the honor of meeting Christopher during my employment with the Chicago
> Police Department. In a work environment I have come to know Christopher as a
> responsible officer who is civic minded and goes beyond the call of normal duty to
> serve the public. I have seen Christopher assist citizens in a kind hearted manner that
> bring calm to an otherwise intense situation. Christopher in my experience does not
> let monotony rule his judgement as he has always treated people as exclusive
> individuals. As for co-workers, Christopher is a person who can get along with
> anyone as he resists the need to pass judgement. His fair and level headed
> personality brings fellow officers together.

Even citizens, who did not know Chris on a personal level, were impacted by his

compassion and selflessness, even based upon the briefest of encounters. These people had

nothing but admiration and praise for him. One example is Lisa Lopez, who experienced a

harrowing ordeal on a very cold night when her car broke down with her young son in the back

seat. She was cold, stranded and without a means to get help for herself or her son. Just then,

Chris and his partner pulled up in their squad car. Touched by the unfailing kindness shown to

her, Ms. Lopez was compelled to write to Commander Malloy of the 8th District Police Station.

In her letter, Ms. Lopez recounted the actions of Chris and his partner:

> [T]hey offered to take a look under the hood…They managed to get my car started
> for me, and then refused to take anything for their time. They wouldn't even let me
> buy them a cup of coffee to warm them up! I truly don't know what I would
> have done if they hadn't stopped to check on me. I don't know how much longer my son
> would have been able to sit in that freezing car…I am deeply indebted to these 2 men
> for their concern and assistance. They insisted that they were 'just doing their jobs,'
> but I know this was above and beyond the call of duty…Officers Lenti and Murphy
> are my heroes.

Chris quickly became a highly decorated officer, honored with over seventy awards and

commendations for his efforts. One of the proudest moments for Chris came when he was

distinguished with several awards regarding the confiscation of 125 kilos of cocaine worth $15.6

million dollars. These awards included the prestigious Cook County Sheriff's Law Enforcement

Award of Merit and the Resolution Adopted by the City Council of the City of Chicago.

Receiving all of this recognition did not in any way reduce Chris's humility or graciousness.

Roberto Elsayed shared his reaction to having seen reports of Chris's efforts to fight the war on

drugs:

> I'll never forget the night I was watching the news and I saw my cousin on TV
> talking about 'being happy that the drugs that he seized that night would never make
> it in the hands of our kids'…To this day, Chris is very modest about the things that
> he does at work. In fact, he rarely talks about work at all unless I ask him.

Recognition by his peers of his hard work and outstanding efforts was manifested when

Chris was invited to join the Tactical Unit, a specialized unit of select and elite police officers.

Such an invitation is not bestowed on just any officer. Chris did not rest on his laurels. He took

his job seriously and prided himself in protecting and serving his community.

During ten (10) years of service Chris has not had any complaints of brutality and a minimal number of complaints registers lodged against him. What is more, none of those registers were ever substantiated. His glowing reputation on the police force even reached officers who did not work directly with him. This is further evidenced by comments like that of Captain Joseph Blas, who recalled:

> When Officer Lenti graduated from the Chicago Police Academy, he was assigned to the district in which I worked, he did not work on my watch, but I was made aware of his good work ethics by his supervisors.

When his indictment was passed down, Chris was indefinitely stripped of his police powers. He was reassigned to the Evidence and Recovered Property Section. While others in this situation might have lamented their lot and bemoaned their predicament, Chris again showed his professionalism and dedication to the Chicago Police Department and its important work in all its forms. He fulfilled the duties of his new assignment with the same vigor and intensity as he did on the streets. Sergeant David Blyskal was impressed by what he saw:

> The Evidence and Recovered Property Section had recently been mandated by the Superintendent of Police to dispose of weapons that have been accumulating over the years. In order to facilitate this project I was provided with additional manpower, part of which included Officer Lenti. As you can imagine, I was initially concerned about the motivation, attitude, and overall work habits of an officer in his position. Officer Lenti, despite his personal and professional concerns regarding his future, came to my Unit with an attitude and willingness to work that I felt was commendable.

## IV. CHRIS LENTI, TRUSTED FRIEND AND NEIGHBOR

Along with his dedication to his family and his work, Chris is a true friend. Chris does not meet a stranger. He easily and quickly develops close and lasting friendships, while maintaining and strengthening his existing relationships. Numerous letters to this effect were

written on Chris's behalf. For example, Chris is the type of person who may have asked to serve

as the best man in their wedding. Steve Bugusky selected Chris for this important role:

> Chris was the best man at my wedding this past year. I chose Chris without even
> thinking about it. Of all my friends, I knew I could depend on Chris to help me
> through the most nerve-racking day of my life. I didn't have to worry about a thing
> that day. Chris made sure everything was perfect.

Pat Carroll, Chris's brother-in-law, did the same and had this to say about the experience and the

choice he made:

> I met Chris almost ten years ago, and from the beginning I could see what a great guy
> he is…We became fast friends and the fact that I was marrying his sister wasn't the
> only reason why…When it came time to pick the best man for my wedding the
> choice wasn't a difficult one. Without hesitation Chris was the guy to ask, and
> without hesitation he accepted. For many people outside the family the fact that I
> asked my wife's brother to be my best man seemed ridiculous. But to me it made all
> the sense in the world. Chris is the guy that I know will be there for me no matter
> what the situation. He's the guy who would do anything for me and help me out
> whenever I needed.

> Chris's neighbors were similarly touched by the quality of his character. Joan Maita's

experience is indicative:

> I heard a young single policeman was moving in my first impression was 'oh great.'
> Little did I know that it would be great…Chris is a wonderful neighbor…always
> considerate, polite and very caring of how he keeps his property looking. I seriously
> could not have picked a better neighbor.

For Janet Graham, her experience with Chris as her neighbor exemplified his multi-faceted

generosity. As a single mother struggling to provide the best life for her daughter, Ms. Graham

faced hard times financially. Chris helped out without fanfare, and in a manner that did not make

her feel ashamed. She said:

> Chris is my next-door neighbor to the south. As he became further acquainted with
> me and I him, he learned of my struggling with my finances through various ways.
> I would borrow a family member's lawn mower, as I did not have the funds to buy

7

all the tools needed to run a home. One day he bought a new lawnmower and gave me his old one. He is always doing things like that for me…Sometimes I think he has purchased new things, just so he has an excuse to give me his old stuff and help me out. Also, when he cooks, he has frequently invited my daughter and I to join his family and friends for a meal, and often wraps the leftovers up for us to take home.

Ms. Graham continued to write about the impact Chris has made on her and her daughter:

Chris is one of my daughter's emergency contacts after school, as my position in the banking industry often requires I often work long hours. One time she came home and the front door of our home was slightly open. As instructed, she went directly to Chris' home. He called me at work, relayed the situation, and checked my home for evidence of intruders. Another time, my daughter forgot her key, and he kept her at his home assisting her with her homework and providing her a snack.

Ironically, it was Chris's love and devotion to his family and friends and concomitant desire to help others that ultimately laid the foundation for the events leading up to this prosecution and his guilty plea.

## V. FACTS AND CIRCUMSTANCES OF THE CONDUCT OF OFFENSE

Dating back to Chris's childhood, financial struggle was a fact of life. He worked hard to make ends meet and provided support to family and friends as extensively as he was able.

When his cousin and fellow police officer, Joseph Cataldo, was diagnosed with a brain tumor at the age of thirty, Chris was relentless in his efforts to provide financial, physical and emotional support for his best friend. As his Chris's sister, Debbie Carroll, remembers:

Joey was a proud Chicago Police Officer, like Chris, and the fact that he was in his early 30's and dying of cancer made sense to no one. But there was Chris all through Joey's illness, spending any extra time with him, buying him groceries and helping him get around, as the cancer affected his spine and left him paralyzed from the waist down, and being a support system.

Joe Cataldo eventually succumbed to the cancer after a hard fight. Josephine Filippo recalled Chris's efforts during that difficult period:

8

It was very hard for [Chris] to lose his cousin and best friend. He did so much for him while he was alive, even the benefit Chris held and organized, helped pay for medical expenses and private care at the home.

Chris also helped support his mother when she was dealing with the fallout due to the collapse of her thirty-year marriage to Chris's father. Chris's mother, Concetta Lenti, shared how Chris responded when she was in need:

> My son has also been my rock since my husband divorced me three years ago, it was very difficult because after 30 years of marriage and wonderful children, I was left alone…I never worked, I was a homemaker…The divorce was very hard for all of us, because it was a surprise to me and the children…I was very depressed and lonely and if it was not for my children, I don't know what I would have done. Especially for Chris the oldest, helped me out financially when I needed it and also emotionally…I don't go a day without speaking to my son, he has a big heart.

Chris's sister, Debbie Carroll, was moved by her eldest brother's actions to help their mother:

> After the divorce my mom was devastated. After thirty years of being a wife and a mother, she was on her own. Only because of my brother's sacrifices she wasn't on her own. Day in and day out he helped her rebuild her life. He helped her find a new house and remodel it into something that she could be proud to call home. He talked to her when she was feeling down and he worked as hard as he could, finding side jobs to make extra money, so she could have more than the bare minimum.

These examples of generosity put a significant strain on Chris's finances. So, in an effort to earn extra money Chris set out to find a side job that would be compatible with the rigors and unpredictability of his schedule as a police officer.

### A.  FILLING THE NEED FOR SUPPLEMENTAL INCOME

Chris discovered an opportunity for side work as a security guard at two related businesses, Heavenly Bodies and Cowboys. The initial information he had about this work indicated that it was very well-suited to his unique schedule and the logistical rigors of his primary employment with the Chicago Police Department. Knowing the nature of these two

adult entertainment establishments, Chris was anxious to and quick to make sure this sort of employment was not prohibited in any way by Chicago Police Department policies. To this end, he contacted the Internal Affairs Division to verify whether this employment was permitted. He described the work he would be doing – outside security and checking identification – and was told this sort of work was within the guidelines of approved secondary employment for Chicago Police officers. He was told, consistent with set Departmental General Orders, that as long as an establishment was primarily licensed for something other than the sale of liquor, secondary employment was permissible.

Once Chris was satisfied that this employment was permissible he accepted a position working at these two establishments. The money he earned at them forms the basis for the indictment against Chris. He does not dispute the fact that he omitted monies he made working at these two places from his personal income tax returns. He acknowledges that his failure to do so resulted in a loss to the United States government. The loss amount is the subject of an agreement between Chris and the government. Chris does not make any excuses for his regrettable actions and grievous misjudgment. He knows what he did was wrong. His goal is to make things right and put this experience behind him and apply the lessons learned as he moves forward. At the same time, it is important for there to be some context and explanation provided for what happened along the way leading up to this point. Again, the objective is explanation and not excuse.

When Chris was hired to work at Heavenly Bodies and Cowboys, he believed that he would be and was an employee of these two places. He expected to be paid as such through payroll for the shifts he worked. Nothing he was told or saw at the outset made him think

10

otherwise, including being required to fill out an Internal Revenue Service W-4 form prior to his first shift.  He was also required to follow set procedures and guidelines enforced by his employer, which only reaffirmed in his mind that he was an employee and not a private contractor.  Chris's assumption and belief was actually supported by an unlikely source.  At the trial of Keith Fuelling (*United States v. Fuelling*, 1:05 CR 00329), a case involving a similarly charged officer involving nearly identical facts, the government called Internal Revenue Service Agent Robert Ellis to testify as an expert.  Agent Ellis offered an opinion that Fuelling was an employee as opposed to a private contractor.  Agent Ellis arrived at this conclusion by applying the "20 Factors" criterion to determine how to classify types of workers listed in the Internal Revenue Service's Revenue Ruling 1987-41.   There is nothing about the facts of this case compared with that of Fuelling's case to indicate any reason for a different opinion or conclusion had the present case gone to trial.

Unquestionably, Chris had the ultimate responsibility for tracking his income for the purposes of filing state and federal taxes.  All the while, he expected – as nearly all employees naturally would – his employer would record his earnings and make the appropriate withholdings in accordance with the W-4 form he completed.  Chris repeatedly requested W-2 forms when he had not received them in a timely manner.  He was assured by management that they were forthcoming.  By the time he prepared his tax returns, assisted by a tax preparer, Falsino Lerma at 18th & Ashland Tax Service, he still had not received any tax documents reflecting his work at Heavenly Bodies and Cowboys.  Chris asked his tax preparer what his options were.  Chris's tax preparer told Chris that he should file his taxes with the information he had currently at the time.  Then, whenever Heavenly Bodies and Cowboys sent the W-2 forms, he could then amend his tax

return.  The advisor informed Chris that he would have three years from that tax year to file an amended return, which incorporated the extra amount of income.  To further substantiate this advice, Chris was informed by some of his co-workers that the Internal Revenue Service had a website called OOPS!.  A visit to that site essentially confirmed what his tax advisor told him about amending taxes and the amount of time he had to do so.

At the time of Mr. Lenti's indictment, the three years had not yet passed from his first year of employment at Cowboys and Heavenly Bodies.  Chris understands now that he should have asked for an extension to file or made other attempts to ensure the inclusion of his side income in his tax returns.  He did not do so.  He realizes he will have to accept the consequences of this misstep.  Chris admits full culpability for filing inaccurate tax returns.  That said, he never started out with the intent to defraud the Internal Revenue Service or the United States government.  In his letter, Sergeant Thomas Giudice recognized Chris's remorse and did well to put the situation in context:

> [W]hen Christopher came to me and told me of his indictment of this offense it was with a heavy heart and remorse.  This is a person who only wanted to do good for his community and family.  I have spent the last 8 years of my life with the Internal Affairs Division of the Chicago Police Department and have sent to prison officers who were a disgrace to the Department, the city and their family by doing criminal acts.  This is not the case with Christopher; he worked this part time job to help his family through financial difficulties.

## B.  THE IMPACT OF THE BUSINESSES ON THE SITUATION

Evidence regarding the organizational and administrative shortcomings at Heavenly Bodies and Cowboys was significant.  Taking into account these shortcomings, it should come as no surprise that there was inadequate or missing documentation as to Chris's earnings.

12

Photographs of the warehouse owned by the owner of the clubs depicted documents and records heaped into unkempt piles on the floor. Still other records were stuffed into black garbage bags.

Additionally, certain managerial procedures used to document work done by the various employees were unusual and unconventional. Just before Chris stopped working at Heavenly Bodies and Cowboys, a bouncer told him how it had been a common practice for the manager on duty to have a non-police officer bouncer cover shifts when a police officer could make their assigned shift. In these instances bouncers would punch in on the officer's timecard. Doing so was easily accomplished because, for as long as Chris worked there, the timecard machine was located in the back of the building where any employee could access the timecards and time clock. Management at these establishments assented to and even directed these procedures. First, doing so gave the appearance of qualified staffing at all positions at all times. Second, this enabled bouncers to be paid the police officer's rate for work which was significantly higher than the bouncer's rate. These procedures were duly confirmed by one of the mangers, Debra Vibert. She worked at Heavenly Bodies and testified at the trial of Keith Fuelling.

Due to the nature of Chris's hectic and many times unpredictable work schedule at the Chicago Police Department, Chris did not work some of his scheduled shifts at the club. This meant that bouncers had worked his shift for him on multiple occasions. Payment of all employees was in cash. Each employee signed a receipt with their name on it before receiving their money. If a bouncer had covered a police officer's shift, the bouncer signed the receipt in lieu of the officer. It was in this way that Chris was unaware of this practice, despite his timecard being used and his name written on the receipt.

13

The bottom line is that records of work allegedly done and wages allegedly paid could not be relied upon as accurate. In fact, some of the records from Heavenly Bodies and Cowboys directly contradicted readily verifiable records proving Chris had not worked a certain night. These records include Chris's police FOP book and the Attendance and Assignment records from the Chicago Police Department. Additionally, certain receipts purportedly reflecting payments received by Chris reflected signatures or notations not made by Chris himself or at his direction. Some even went so far as to show an entirely different name as the signature on the receipt.

None of the foregoing is intended in any way to call into question the factual basis for Chris's plea or entry of a conviction based upon it. However, understanding the circumstances and environment where the work was done is integral to create an accurate picture surrounding Chris's supplemental income and related failure to accurately state his income and, thereby, adequately pay his taxes. In turn, all of this is important to consider in formulating a fair and just sentence.

## VI. CRAFTING A SENTENCE

Determining an appropriate sentence in light of *United States v. Booker*, 543 U.S. 220 (2005), now more than ever calls upon the sentencing judge to seek guidance from 18 U.S.C. §3553. Subsection (a) of this provision, "Factors To Be Considered in Imposing a Sentence," lays out seven factors for a court to consider. Prior to setting out those factors, section (a) provides, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set froth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --":

14

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed –

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

    (C)  to protect the public from further crimes of the defendant; and

    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established …

\* \* \*

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).  Careful consideration of the facts of this case against these factors weighs heavily in favor of leniency in fashioning a sentence for Lenti.  While prior to *Booker* defendants sought "downward departures," in the context of today's sentencing philosophies the focus is more properly placed on determining the harshness of a given sentence based upon consideration of these factors.  The bottom line is that the ultimate decision on how to sentence a defendant is left to a trial court's sound discretion.  Yet, the Sentencing Guidelines provide the factors contained in § 3553 to aid courts in reaching sentencing decisions.  To this end, what follows is an examination of how some of these subsections mesh with the facts of Lenti's case.

As for subsection (1), this memorandum and the materials referenced herein provide answers to the question necessarily posed by this factor. The "nature and circumstances" of this offense are not unusual on some level. At the same time, the procedures and manner of doing business utilized by Cowboys and Heavenly Bodies created a unique challenge for someone in Lenti's position. He was not, by any means, alone in the situation he faced and the prospects he now faces. In fact, numerous other officers faced similar charges. In addition, "the history and characteristics" of Lenti, as discussed above, show him to be a solid, well-principled human being who cares deeply for his family and friends and who approached his life's work with the Chicago Police Department with dedication and unparalleled professionalism.

Subsection (2), which discusses the "need for the sentence imposed" similarly weighs in favor of a sentence on the low end of the spectrum. Lenti admits his wrongdoing and accepts responsibility for his wrongs. Having this experience as his first instance of being accused of wrongdoing, the seriousness of the crime charged is not by any means lost on him. Furthermore, enduring the process up to this point, while a valuable learning experience on many levels, has most importantly served as deterrent to any future conduct of this sort or any other conduct that could subject Lenti to question or accusation. In a similar vein, in light of the deterrent value of this process, any sentence great or small would only serve to reinforce Lenti's already firm commitment to live his life guided by good judgment and well-informed decision making.

Taking subsection (7) out of order, there is a need to "provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Lenti has recognized this fact throughout this prosecution. As has been discussed previously, Lenti entered into an agreement with the government which established an agreed value for the loss to the government by his acts and omissions. Restitution

16

is a big part of the effort when it comes to Lenti's wanting to make right the wrongs he committed. Beyond its relation to subsection (7), the fact Lenti made the effort to reach an agreement is an important fact to consider on its own. This act represents an admission of his guilt in addition to his plea and serves to reinforce his acknowledgment of the impact of his wrongs and the consequences he must face as a result.

Subsection (6) is possibly the most important to consider but not necessarily the most self-evident without additional information. The reality is that Lenti was not the only officer charged for filing inaccurate or incomplete tax returns. In excess of ten (10) police officers were indicted in all. Some were dismissed outright. Several were convicted of felonies pursuant to entering into plea agreements or after a trial on the merits. Each of the officers convicted of a felony received probation. None of them received any jail time.

The most closely analogous case of all the previous prosecutions is that of David Miro. Mr. Miro was a police officer like Lenti. He was charged with the same crime as Lenti was. Also like Lenti, Miro pled guilty to a misdemeanor. Upon accepting Miro's plea of guilty, the Honorable Judge Blache M. Manning sentenced him to pay a fine premised on the loss to the government. No term of probation or any other form of punishment was imposed upon Miro. A similar sentence in this case would conform to the intent and design of subsection (6). In addition, such a sentence – not involving a term of probation – would reduce the risk of adverse employment consequences for Lenti.

While there are no guarantees, if Lenti is not given a sentence of probation it will increase the likelihood that he will be able to return to his work on the streets for the Chicago Police Department, which was a role he was particularly well-suited for, excelled at, and was a

17

tremendous asset to the City of Chicago, the Department, and the citizens of this city. The ultimate outcome on this point is up to the determination of the administrative proceedings yet to come. At the same time, the outcome of these proceedings will likely have some bearing on those proceedings.

A fine would satisfy the ends of justice and would benefit the City of Chicago, the Chicago Police Department, and the citizens of this city by creating the greatest likelihood for Lenti to return to the force and continue the good work he started as a police officer. Consider the following testimonials:

- William Dougherty:

I hope that Chris is soon working the streets again. This would be a big asset to the Chicago Police Department as well as to the community that he is assigned to.

- Edmund Zelazik:

[Chris] was and still is an asset to the city of Chicago, the Chicago Police Department, and the neighborhoods he works in. He would be the first one on the job, to put his life in harms way. Chris' positive attitude and strong work ethic has proven to influence his peers, bring them to a higher level. He is proud to be a Chicago Police Officer and we are proud to call him one of our own. He would be a tremendous loss to the department.

- Sergeant Jason Vucko:

Chris has kept his head up and tried to stay in good spirits since his indictment. He has received tremendous support from his family and friends, and I think I speak for all of them when I say that I can't wait for him to get back to the district where he can continue to serve his community as a dedicated and hard working police officer that he is.

## **CONCLUSION**

In light of the foregoing, Chris Lenti respectfully seeks from this Honorable Court to consider the foregoing in fashioning a sentence in this case, including particular attention to the possibility of imposing a sentence requiring him to pay a fine without imposing a term of probation. Such a sentence would serve the interests of justice, is sufficiently remedial, has a significant deterrent effect, and is consistent with other sentences previously imposed in other similar cases.

Respectfully submitted,


\_\_\_/s/ Terence P. Gillepsie_____
One of his attorneys

TERENCE P. GILLESPIE
GENSON & GILLESPIE
53 West Jackson Blvd., Suite 1420
Chicago, Illinois 60606
(312) 726-9015

JOSEPH V. RODDY
LAW OFFICES OF JOSEPH V. RODDY
77 West Washington St., Suite 1100
Chicago, Illinois 60602
(312) 368-8220

19

## <u>CERTIFICATE OF SERVICE</u>

I, Terence P. Gillespie, hereby certify that I caused to be electronically filed

Defendant, Christopher Lenti's Sentencing Memorandum on this 19th day of January

2007 through the CM/ECF System of the Clerk of the United States District Court for the

Northern District of Illinois, which constitutes service of the same.


                                      /s/ Terence P. Gillespie
                                      One of Lenti's Attorneys


TERENCE P. GILLESPIE
GENSON & GILLESPIE
53 West Jackson Blvd., Suite 1420
Chicago, Illinois 60606
(312) 726-9015

JOSEPH V. RODDY
LAW OFFICES OF JOSEPH V. RODDY
77 West Washington St., Suite 1100
Chicago, Illinois 60602
(312) 368-8220